# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO NAVY BROADWAY COMPLEX COALITION,<br><br>                   Plaintiff,<br>vs.<br><br>UNITED STATES COAST GUARD; CAPTAIN THOMAS M. FARRIS, in his official capacity as the United States Coast Guard Captain of the Port, San Diego;<br><br>                   Defendants. | CASE NO. 10cv2565-IEG(RBB)<br><br>Order Denying Plaintiff's Motion for Summary Judgment |

Plaintiff San Diego Navy Broadway Complex Coalition ("SDNBCC") has filed a Second Amended Complaint for Declaratory, Injunctive, and Mandamus Relief, alleging that Defendants, the U.S. Coast Guard and Captain Thomas Farris violated the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 553 and 706.[1] Plaintiff now moves for summary judgment on its claims. Following oral argument, and upon consideration of the parties' arguments, the Court DENIES Plaintiff's motion.

## *Background*

Plaintiff commenced this action on December 15, 2010, challenging the Defendants'

---

[1] Plaintiff has voluntarily dismissed all claims against non-Federal Defendants, and all claims based upon Defendants' failure to enforce a security zone pursuant to 33 C.F.R. § 165.1108(b)(2). [Doc. No. 31 (dismissing non-Federal Defendants) and Doc. No. 44 (Second Amended Complaint, deleting causes of action).]

failure to enforce the 100-yard on-shore security zone described in 33 C.F.R. § 165.1108(b)(2). On December 17, 2010, Plaintiff applied for a temporary restraining order, asking that the Court enforce the security zone, including excluding all persons from the Broadway Pier and other areas within 100 yards on-shore of any cruise ship berthed at the Pier unless such individual applied for and received an exemption from the Captain of the Port ("COTP"). [Application for Temporary Restraining Order, Doc. 4, p.2.]

After they were served with the Complaint and Application for TRO, but before the hearing on Plaintiff's application, on December 20, 2010, Defendants issued a Temporary Final Rule ("TFR"), Docket No. USCG-2010-1129, suspending paragraph (b)(2) of § 165.1108, thus eliminating the 100-yard on-shore security zone. [Declaration of Commander Leon Guerrero in Support of Defendants' Opposition to Plaintiff's Application for TRO ("Guerrero Decl."), Doc. No. 20-1, Exhibit 4.] The TFR was issued without prior notice and opportunity for public comment based upon the Coast Guard's finding that such procedures would be "contrary to the public interest ... due to the opening of the Broadway cruise ship terminal and the anticipated arrival of cruise ships immediately thereafter, including on December 22, 2010." The Coast Guard further found "[i]t is in the public interest to avoid the potential disruption that could be caused to major roadways just onshore" and "security interests can continue to be maintained during the ensuing notice and comment rulemaking to amend Section 165.1108(b)(2)."

The Court denied Plaintiff's application for a TRO, finding Plaintiff had not shown a likelihood of success on the merits of its claim for mandamus and injunctive relief. In particular, the Court concluded Plaintiff had not shown that the Coast Guard had a mandatory duty to enforce the on-shore security zone in any particular manner which could be directed by the Court. [Doc. No. 32.] Plaintiff thereafter amended its complaint to challenge the validity of the TFR. [Doc. No. 33.] After the Coast Guard issued a Notice of Proposed Rule Making ("NPRM") for the long-term revision of 33 C.F.R. § 165.1108(b)(2), Plaintiff dismissed its claims for enforcement of the on-shore security zone. [Second Amended Complaint, Doc. No. 44.] Therefore, the only remaining claims in this case are Plaintiff's challenge to the validity of the TFR.

The Coast Guard filed the NPRM for public inspection on January 26, 2011, and the notice

1 was published the following day. The comment period ran through February 28, 2011. The Coast
2 Guard received no comments on the NPRM. [Declaration of Commander Kevin F. Bruen, USCG
3 ("Bruen Decl."), ¶ 13.] At the hearing, counsel for Defendants indicated the final rule will be
4 available at the Office of the Federal Register for inclusion in the Federal Register on March 16,
5 2011. The rule will be published on March 20, 2011, and will become effective 30 days later, on
6 April 20, 2011.

### *Summary Judgment Standard*

Summary judgment is proper where the pleadings and materials demonstrate "there is no genuine issue as to any material fact . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). However, because the court is not generally called upon to resolve questions of fact in reviewing an agency action, the ordinary summary judgment standard set forth in Rule 56(c) does not apply. Nehemiah Corp. v. Jackson, 546 F. Supp. 2d 830, (E.D. Cal. 2008); Ohio Valley Environmental Coalition v. Hurst, 604 F. Supp. 2d 860, 879 (S.D. W. Va. 2009). The court's role in reviewing agency actions under the APA is "not to resolve facts, but to 'determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did'." The Save the Peaks Coalition v. U.S. Forest Service, 2010 WL 4961417 at *6 (D. Ariz. Dec. 1, 2010) (quoting Occidental Eng'g Co. v. INS, 753 F.2d 766, 769 (9th Cir. 1985)).

A district court reviewing an agency decision under the APA is ordinarily limited to the administrative record. Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agriculture, 499 F.3d 1108, 1117 (9th Cir. 2007). Evidence outside the administrative record is admissible only where it falls under one of the following four "narrow" exceptions:

> (1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) if the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith.

Id. (citing Southwest Ctr. for Biological Diversity v. U.S. Forest Service, 100 F.3d 1443, 1450 (9th Cir. 1996)).

*Discussion*

Plaintiff argues it is entitled to summary judgment on its claims under the APA because (A) there was no "good cause" excusing the Defendants from complying with the notice-and-comment procedures required by the APA, and (B) there is no evidence supporting Defendants' decision to promulgate the TFR.[2]

A. *Good Cause Excusing Compliance with Notice-and-Comment Procedures*

Plaintiff first argues that the undisputed evidence shows there was no good cause excusing Defendants from utilizing the notice-and-comment procedures called for by the APA. As a general rule, administrative agencies must give public notice, and provide an opportunity for comment, before engaging in rule-making. "The 'principal purpose' of section 553 of the APA is 'to provide that the legislative functions of administrative agencies shall so far as possible be exercised only upon public participation'." San Diego Air Sports Center, Inc. v. FAA, 887 F.2d 966, 969 (9th Cir. 1989) (quoting S. Doc. No. 248, 79th Cong., 2d Sess. 257 (1946)). The agency may dispense with the ordinary notice-and-comment procedures where "the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B). The rule should be published at least 30 days before its effective date absent good cause. 5 U.S.C. § 553(d)(3).

The "good cause" exception is to be narrowly construed.[3] San Diego Air Sports Center, 887 F.2d at 969. The APA's notice and comment procedures should be waived "only when 'delay

---

[2] In its moving papers, Plaintiff sets forth the bases upon which it has standing to challenge Defendants' actions. Defendants do not challenge Plaintiff's standing in opposition to the current motion.

[3] There is a conceptual difference between the "good cause" exception to the notice and comment requirements, and the "good cause" exception to the 30-day delay requirement. Riverbend Farms, Inc. v. Madigan, 958 F.2d 1479, 1485 (9th Cir. 1992). It is much easier to demonstrate good cause for the failure to provide a 30-day waiting period, so long as affected parties have time to adjust their behavior before the final rule takes effect. Id. In their papers, both parties here focus on the "good cause" standard applicable where an agency has failed to provide notice and a comment period. The Court finds the Coast Guard meets the higher "good cause" standard required where an agency dispenses with the notice and comment period. Thus, the Court need not discuss the alternative and more lenient standard with regard to the failure to delay enactment of the rule for 30-days.

would do real harm'." Hawaii Helicopter Operators Ass'n v. FAA, 51 F.3d 212, 214 (9th Cir. 1995) (quoting Buschmann v. Schweiker, 676 F.2d 352, 357 (9th Cir. 1982)). On review, courts examine the asserted good cause on a case-by-case basis, "sensitive to the totality of the factors at play." Id. (citing Alcaraz v. Block, 746 F.2d 593, 612 (9th Cir. 1984)). "It is antithetical to the structure and purpose of the APA for an agency to implement a rule first, and then seek comment later." Paulsen v. Daniels, 413 F.3d 999, 1005 (9th Cir. 2005).[4]

Here, the TFR stated it was issued without public notice and opportunity to comment because "it is contrary to the public interest not to issue a rule that is effective by December 21, 2010." The TFR cited the following three reasons why delay would be contrary to the public interest: (1) "the opening of the Broadway cruise ship terminal and the anticipated arrival of cruise ships immediately thereafter, including on December 22, 2010"; (2) "to avoid the potential disruption that could be caused to major roadways just onshore"; and (3) to "relieve an unnecessary burden imposed by varying interpretations of 33 CFR 165.1108(b)(2) while providing an effective security zone regulation in its place during a notice-and-comment rulemaking." [Guerrero Decl., Exhibit 4, pp. 22-23.] The TFR was made effective through June 20, 2011, and noted that "the Coast Guard will initiate a separate, notice-and-comment rulemaking proposing to amend 33 CFR 165.1108(b)(2) while this temporary rule is in effect." [Id., p.23.]

Plaintiff argues that neither the opening of the Broadway cruise ship terminal, nor the potential disruption to major roadways, constituted good cause to dispense with the notice-and-comment period. Plaintiff also argues there was no uncertainty regarding the interpretation of § 165.1108(b)(2). By way of background, shortly after 33 C.F.R. § 165.1108 was enacted,

---

[4]Plaintiff appears to argue the Court should apply a heightened "good cause" standard, because the TFR suspended a portion of a rule initially promulgated using the ordinary notice and comment procedures. The cases cited by Plaintiff, however, address the line between "substantive" rules subject to APA rulemaking procedures, and "procedural" rules that an agency may alter without providing notice and comment. Sequoia Orange Co. v. Yeutter, 973 F.2d 752, 757 (9th Cir. 1992); Arlington Oil Mills, Inc. v. Knebel, 543 F.2d 1092, 1100 (5th Cir. 1976)). In those cases, the courts found the decision to alter procedures was in fact substantive, and subject to APA procedures, because the original rule was adopted after a notice and comment period. Here, there is no dispute that the APA notice and comment mechanism applies in the absence of good cause. To be certain, an agency has a duty to explain a departure from precedent. See Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade, 412 U.S. 800, 808 (1973). The Court will consider this rule when analyzing whether the Coast Guard abused its discretion in suspending paragraph (b)(2). However, there is no heightened "good cause" standard.

1  Congress passed the Maritime Transportation Security Act, and the Coast Guard issued regulations
2  requiring all Maritime Transportation Facilities ("MTFs") to prepare Facility Security Plans
3  ("FSPs"). [Bruen Decl., ¶ 5 (citing 33 C.F.R. 105.400-415).] San Diego's B Street Pier has been
4  operating as a MTF, under a FSP approved by the Coast Guard in November of 2004. With the
5  approval of the B Street Pier FSP, the Coast Guard determined it was no longer necessary for the
6  security zone described in § 165.1108(b)(2) to extend on-shore. [Bruen Decl., ¶ 6-7.] The Coast
7  Guard, however, took no action to amend the regulation.

8        On December 8, 2010, Plaintiff sent a letter to the COTP San Diego requesting a meeting
9  regarding the Coast Guard's enforcement of the regulation. [Bruen Decl., ¶ 8.] Once the COTP
10 received Plaintiff's letter, he consulted with the Coast Guard's Prevention and Legal Division,
11 which determined the on-shore security zone was no longer necessary because the existing FSP
12 addressed shore side security concerns. [Bruen Decl., ¶ 8.] Therefore, on December 13, 2010, the
13 Coast Guard Legal and Prevention division decided to initiate NPRMs to amend the regulation.
14 [Id.] Before the Coast Guard could undertake to initiate that process, however, Plaintiff filed the
15 current action and sought a TRO.

16       Plaintiff argues the lapse in time between the passage of the Maritime Transportation
17 Security Act and the Coast Guard's enactment of the TFR suspending § 165.1108(b)(2) belies
18 Defendants' good cause argument. Plaintiff argues the Coast Guard had many years to recognize
19 and address the purported overlap between the FSP for the B Street Pier and the on-shore security
20 zone established by § 165.1108(b)(2). In addition, Plaintiff argues cruise ships have been arriving
21 at the Port of San Diego for many years, at both the Broadway Pier and the B Street Pier, and there
22 is no evidence of a single previous traffic problem caused by the 100-yard on-shore security zone.
23 Defendants should have recognized that when a large cruise ship was moored at the new
24 Broadway cruise ship terminal, the on-shore security zone would extend to and through the Harbor
25 Drive and Broadway intersection. Therefore, the urgency was created by Defendants' own lagging
26 and failure to amend the regulation through ordinary procedures. Plaintiff contends this urgency,
27 created by Defendants' own failure to act, does not constitute good cause.
28       The Court disagrees. As Defendants point out in opposition, for many years the Coast

1  Guard had interpreted § 165.1108(b)(2) so as not to require complete exclusion of persons from
2  the on-shore security zone, believing on-shore security around cruise ships at the Port of San
3  Diego was within the scope of the governing FSP. Plaintiff sought to change the status quo by
4  seeking a TRO enforcing the security zone and closing the on-shore area within 100 yards of any
5  cruise ship berthed at the Broadway Pier. If the Holland America Line's *Oosterdam* was moored
6  at the Broadway Pier, as it was expected to be on December 22, 2010, this on-shore security zone
7  would have encompassed the esplanade along San Diego Bay, the boardwalk in front of Broadway
8  Pier, and the entire intersection of Broadway and Harbor Drive. Plaintiff argued in its application
9  that the Captain of the Port was *required* to "issue specific exemptions to the persons entering the
10 zone" and could not grant blanket permission for unknown persons to drive or walk past
11 Broadway Pier along the public right-of-way. Thus, although the regulation had previously caused
12 no traffic problems on-shore, the Coast Guard reasonably believed the TRO requested by Plaintiff
13 would have resulted in a substantial disruption and diversion of Coast Guard resources. The Coast
14 Guard attempted to mitigate the effects of the TFR by limiting its temporal effect through June 20,
15 2011. The Coast Guard also explicitly indicated its intent to initiate a formal noticed rulemaking
16 process during which the public could submit comments. Based thereon, the Court concludes the
17 Coast Guard properly invoked the "good cause" exception to the APA's notice and comment
18 requirements under 5 U.S.C. § 553(b)(3)(B) and (d)(3).

19       Even if the Coast Guard did not have good cause to excuse its compliance with the notice
20 and comment requirements, the Court further concludes such error was harmless. The APA
21 provides that when a court reviews a challenged agency action, "due account shall be taken of the
22 rule of prejudicial error." 5 U.S.C. § 706. "[T]he burden of showing that an error is harmful
23 normally falls upon the party attacking the agency's determination." Shinseki v. Sanders, __ U.S.
24 __, 129 S. Ct. 1696, 1706 (2009). Where an agency erroneously fails to comply with the APA's
25 procedural requirements, "the failure to provide notice and comment is harmless only where the
26 agency's mistake 'clearly had no bearing on the procedure used or the substance of decision
27 reached'." California Wilderness Coalition v. U.S. Dep't of Energy, 631 F.3d 1072, 1090 (9th Cir.
28 2011).

1    In this case, it is difficult to see how the "procedure used or the substance of the decision 2 reached" would have been different if the Coast Guard had proceeded through the ordinary notice 3 and comment procedures required by the APA. Plaintiff points to the declarations filed by its 4 members, Diane Coombs and Ian Trowbridge, both of whom state they are concerned about the 5 Defendants' suspension of the on-shore security zone and would have expressed those concerns if 6 they had been given an opportunity prior to enactment of the TFR. [Declaration of Diane Coombs, 7 Doc. No. 34-4, ¶¶ 4 & 7; Declaration of Ian Trowbridge, Doc. No. 34-5, ¶ 4.] Plaintiff further 8 argues that if had been given opportunity to submit comments, it would have retained a security 9 expert to write a report in response to the NPRM, refuting the Coast Guard's claim that the on-10 shore security zone around cruise ships is no longer necessary. However, neither Plaintiff nor any 11 of its individual members actually participated in the rulemaking process once they were given an 12 opportunity to do so. In addition, neither Plaintiff nor the individual members indicate what 13 comments they would have made or demonstrate how those comments would have contributed to 14 the Coast Guard's decision whether to suspend the on-shore security zone. Therefore, the Court 15 finds any error flowing from the Coast Guard's enactment of the TFR without the ordinary notice 16 and comment period was harmless. Plaintiff's motion for summary judgment on count one of its 17 Second Amended Complaint is DENIED.

18   **B.    *Evidence Supporting the TFR***

19   Plaintiff argues it is also entitled to summary judgment on its claim under § 706(2) of the 20 APA because the Defendants' decision to promulgate the TFR is not supported by any evidence in 21 the record. An agency's action in promulgating regulations may be set aside if found to be 22 "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. 23 § 706(2)(A); Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins., 463 U.S. 29, 41 (1983). 24 Under such standard, an agency "must examine the relevant data and articulate a satisfactory 25 explanation for its action including a 'rational connection between the facts found and the choice 26 made'." Id. (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)). The 27 agency need only give a "cogent explanation" for its action. Humane Society v. Locke, 626 F.3d 28 1040, 1054 (9th Cir. 2010). Judicial review of the agency's decision is highly deferential, and the

agency action is presumed to be valid. Buckingham v. Secretary of the U.S. Dep't of Agriculture, 603 F.3d 1073, 1080 (9th Cir. 2010). However, "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 42.

Here, Plaintiff argues there is no documentation in the agency's docket regarding the reason for rescinding the on-shore security zone. In addition, the TFR itself contains only a conclusory statement that the on-shore security zone is no longer necessary notwithstanding the fact the regulation was originally enacted based on serious concerns for national security. When the on-shore security zone was established in 2002, the Coast Guard found the "security zone is needed for national security reasons to protect the public and ports from potential subversive acts." 67 Fed. Reg. 6648 (Feb. 13, 2002). In issuing the rule, the Coast Guard pointed to the September 11, 2001 terrorist attacks, the FBI's multiple warnings concerning the potential for additional terrorist attacks within the United States, ongoing hostilities in Afghanistan and growing tensions in Iraq, and the desire to put U.S. ports on a higher state of alert because the Al-Qaeda and other organizations had declared an ongoing intention to conduct armed attacks on United States interests. 68 Fed. Reg. 1006 (Jan. 8, 2003). By contrast, the TFR states only that "[t]he COTP has determined the security zones for moored cruise ships in San Diego Harbor need not include any land." [Guerrero Decl., Exhibit 4, p. 24.] This conclusion is "[b]ased on experience with actual security zone enforcement operations." [Id., p. 23.] Although the Coast Guard had determined that the FSP provided sufficient protection for the on-shore areas previously covered by § 165.1108(b)(2), the TFR does not in any way refer to the FSP or otherwise alert the public that some alternative provision is already in place for securing the area on-shore around cruise ships at the Port of San Diego.

At the time of the hearing, counsel for Defendants urged the Court to look outside of the administrative record, to the declaration of Commander Bruen, for an explanation of why the Coast Guard acted as it did. An agency need not provide all explanation for its action within the Federal Register notice or the rule itself. Midwater Trawlers Co-operative v. Department of Commerce, 393 F.3d 994, 1006 (9th Cir. 2004). Nothing within the APA or case law requires an

agency to provide the explanation for its action in the Federal Register. Id. (noting that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA."). The court may allow supplementation of the record where "necessary to explain agency decisions." Id. at 1006. In considering extra-record evidence, the court must refrain from *de novo* review of the agency's action, and should "focus instead on the agency's decision-making process." Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agriculture, 499 F.3d 1108, 1117 (9th Cir. 2007).

Here, the TFR contains a bare minimum explanation that "[b]ased on experience with actual security zone enforcement operations, the COTP San Diego has concluded that a security zone encompassing all navigable waters, extending from the surface to the sea floor, within a 100 yard radius around any cruise ship that is moored at any berth with the San Diego port area ... would provide for the safety of the cruise ship, vessels, and users of the waterway." [Guerrero Decl., Exhibit 4, p. 23.] The TFR suspends the on-shore security zone because "[t]he COTP has determined the security zones for moored cruise ships in San Diego Harbor need not include any land." [Id., p. 24.] This explanation is, itself, not the type of "cogent explanation" or "reasoned explanation" required where an agency reverses course and rescinds a rule. Humane Society v. Locke, 626 F.3d at 1054; Motor Vehicle Mfrs. Ass'n, 463 U.S. at 42.

The declaration of Commander Bruen, however, explains why the Coast Guard's prior experience with actual security zone enforcement operations lead the agency to conclude the on-shore security zone is no longer necessary. In particular, Commander Bruen explains that under 33 C.F.R. Part 105, all Marine Transportation Facilities ("MTF") are required to conduct a Facility Security Assessment ("MSA") and submit a Facility Security Plan ("FSP"). [Bruen Decl., ¶ 5.] Therefore, with the approval of a FSP for the B Street Pier, there was no longer a need for the security zone to extend over shore. [Id., ¶ 7.] The COTP and the Coast Guard determined that only the San Diego and Los Angeles cruise ship security zones contained language extending the zones to "shore areas." No other cruise ship security zones in the United States extended on-shore. [Id., ¶ 8.] There was also an FSP in place with respect to the Broadway cruise ship terminal as of December 17, 2010, which addressed shore side security concerns. [Id., ¶ 11.]

1  Commander Bruen's declaration demonstrates the Coast Guard did not act arbitrarily, but instead
2  acted to rescind the on-shore security zone contained in 33 C.F.R. § 165.1108(b)(2) after a
3  reasoned analysis of the current need for an on-shore security zone.
4      In hindsight, the Coast Guard would have been wise to include in the TFR a more detailed
5  explanation of the rationale for its action. The Court notes that the Coast Guard explicitly
6  included this analysis in both the NPRM and in the sections discussing the basis, purpose, and
7  background of the new rule. [NPRM, Docket No. USCG-2011-0038; Final Rule, 76 Fed. Reg. 54,
8  15216-17 (Mar. 21, 2011).] However, the APA does not require such explanation be fully
9  contained within the administrative record. Midwater Trawlers Co-operative, 393 F.3d at 1006.
10 Upon review, the Court concludes the Coast Guard did not abuse its discretion in suspending the
11 on-shore security zone contained in subparagraph (b)(2). Plaintiff's motion for summary judgment
12 on this claim is DENIED.

### *Conclusion*

14     For the reasons set forth herein, the Court DENIES Plaintiff's motion for summary
15 judgment.

16 **IT IS SO ORDERED**.

17 **DATED: March 30, 2011**

18                                                        **IRMA E. GONZALEZ, Chief Judge**
19                                                        **United States District Court**